In re Pamela A. OLMSTEAD, Debtor.

Kip M. KALER, as Bankruptcy Trustee for William L. Olmstead and Pamela A. Olmstead, Plaintiff,

v.

Pamela A. OLMSTEAD, Defendant.

Bankruptcy No. 97–31071.
Adversary No. 96–7065.

United States Bankruptcy Court,
D. North Dakota.

Jan. 16, 1998.

David L. Johnson, Fargo, ND, for plaintiff.

## MEMORANDUM OPINION AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The Chapter 7 Trustee, Kip M. Kaler ("Trustee"), commenced the above-captioned adversary proceeding by complaint filed on October 1, 1997, seeking to revoke the discharge of the debtor, Pamela A. Olmstead ("Pamela"), pursuant to 11 U.S.C. § 727(d)(1). The Trustee additionally seeks the recovery of property consisting of at least $700.00 cash, as well as the balance as of the filing date of funds held in one of Pamela's checking accounts. The debtor, appearing pro se in this matter, generally denies the trustee's allegations, and additionally contends that she made full disclosure of her financial circumstances to the several attorneys who represented her at various stages in her bankruptcy proceedings, and to the Trustee, as to all matters now disputed and above-described. A trial on this matter was conducted on December 29, 1997. From the entirety of the evidence presented, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

For approximately the past seventeen years, Pamela, age 34, has lived and worked in the City of Grand Forks, North Dakota. After completing her high school education in 1981, she became employed as a bank teller with Metropolitan Federal Bank (subsequently acquired by First Bank System, Inc. ("FBS")), a position which she held for fourteen years. Her employment with FBS was terminated on February 18, 1995, and she remained jobless until September 1995. At that time, Pamela gained employment as a receptionist with Drees, Risky and Vallenger, Ltd., ("Drees"), a Grand Forks accounting firm.

Pamela filed for divorce from her husband William L. Olmstead ("William") in November 1995, after having been separated from him since February of that year.[1] By the end of May 1996, Pamela knew that she was going to file bankruptcy and had seen an attorney in this regard. On August 23, 1996

---

1. It remained undeveloped at trial whether Pamela ultimately obtained a divorce from William.

("filing date"), Pamela and William filed a joint voluntary petition for protection under Chapter 7 of the United States Bankruptcy Code ("Code"), along with their bankruptcy schedules. In late September 1996, the Trustee conducted the Section 341 first meeting of creditors. Pamela received a Chapter 7 discharge in bankruptcy on December 2, 1996. On April 18, 1997, Pamela was deposed in the offices of the Trustee in Fargo, North Dakota. On October 1, 1997, the Trustee filed a complaint seeking revocation of Pamela's discharge, as well as the recovery of undisclosed funds.

Pamela's August 1996 bankruptcy petition is replete with numerous omissions and misstatements. First, in her schedules, Pamela failed to disclose her actual "current income," by underreporting her income from Drees, by failing to report income received from the sale of Mary Kay beauty products, and by failing to disclose FBS severance pay which she claims to have harbored and spent prior to, during, and beyond the filing date. Second, Pamela failed to disclose the actual amount of cash on hand in her possession, and also failed to disclose two checking accounts which she maintained, and the balance in these accounts, as of the filing date. Third, the information contained within Pamela's schedules, and her testimony at trial and her deposition statements, fail to explain the source of substantial deposits which she made into these checking accounts in the months before, during, and after the filing date. Each of these omissions will be discussed in detail.

*Pamela's Income*

In Schedule I, entitled "Current Income of Individual Debtor(s)," Pamela reported net monthly income from her employment with Drees of $800.00 per month, and also reported receiving $441.00 in alimony, maintenance or support payments from William, for a total disclosed income of $1241.00 ("disclosed income"). In her April 1996 deposition and at trial, Pamela additionally disclosed her receipt of $400.00 monthly from William towards her house payment ("housing monies"), this sum constituting one-half thereof. During trial, she repeatedly represented and maintained that her disclosed income and housing monies were her only source of income prior to, at the time of, and after the filing date.

Yet, in her deposition and at trial, Pamela subsequently disclosed that she earned an average net monthly income of $900.00 from Drees.[2] Even this figure, however, proved inaccurate. According to payroll summaries from Drees submitted by the Trustee, Pamela's average net monthly income for the period of October 1995 thru August 1996 was $1025.44, and for period of January thru August 1996 was $1026.02 per month.[3]

Beyond the income from Drees which she underreported in her schedules and at trial, Pamela also revealed other sources of income which she failed to disclose in her schedules. At trial, Pamela admitted that she sold Mary Kay beauty products, but was evasive and uncooperative in answering the Trustee's questions as to the extent of her income from the sale of these products.[4] At trial she at times attempted to negate and minimize the amount of this income,[5] and at other times denied altogether earning any income from

---

**2.** In this respect, she testified that her attorneys "got in there different things that probably are not true." Nevertheless, as she admitted, she did swear to the truth and accuracy of her petition and schedules in both oral and written form.

**3.** Pamela's actual net income from Drees for the last three months of 1995 and for months of 1996 thru the filing date, are as follows:

| 1995 Drees Wages | Net Income |
| --- | --- |
| October | 836.47 |
| November | 914.73 |
| December | 1320.53 |

| 1996 Drees Wages | Net Income |
| --- | --- |
| January | 883.91 |
| February | 970.74 |
| March | 1033.08 |
| April | 1255.05 |
| May | 875.82 |
| June | 960.10 |
| July | 1266.72 |
| August | 962.74 |

**4.** As to her profit margin from the sale of these products, Pamela testified that if, for example, she made a $10.00 sale, her profit therefrom amounted to $5.00, or one-half the sale amount.

**5.** Pamela testified at trial that although she may have sold some Mary Kay products or to bankruptcy, the sales were "not enough to mention."

the sale of these products. However, when questioned at trial by the Trustee as to her net income from the sale of these products in August 1996, Pamela testified that she could not recall the amount, even roughly, stating that it was "too long ago to remember." [6] Countering Pamela's failing memory and evasiveness on the stand, the Trustee turned to Pamela's deposition statements in this regard. At her deposition, Pamela for the first time informed the Trustee that she derived additional income from a second job selling Mary Kay beauty products before, at the time of, and after the filing date. During her deposition, Pamela stated that she regularly earned at least $160.00–180.00 monthly from the sale of Mary Kay beauty products prior to and after the filing date. Pamela did not disclose any of the income which she derived from the sale of Mary Kay products in Schedule I.[7]

Additionally, uncontroverted FBS severance pay summaries submitted by the Trustee, and which were received without objection at trial, reveal that Pamela received bi-weekly severance payments during the first quarter of 1996. This source of income is relevant to the instant inquiry in that, in her deposition and at trial, Pamela stated that she retained or was in receipt of severance pay through and after the filing date.

Pamela's FBS severance pay plan provided for bi-weekly severance payments in the amount of $849.17 from February 28, 1995, until March 15, 1996, with an additional payment of $65.32 on March 31, 1996. Thus, Pamela's FBS severance pay totaled $21,947.69, with her 1996 severance pay amounting to $4,311.17. Pamela made no mention on Schedule I of receiving or possessing any interest in severance pay from FBS as of the filing date.

*Pamela's Personal Property*

In Schedule B, entitled "Personal Property," Pamela disclosed her interests in $100.00 cash on hand and $300.00 held in "Community National Savings" as of the filing date. At trial, the Trustee questioned Pamela about the actual amount of cash on hand which she held in her possession as of the filing date, and asked her if she held $200.00 cash in a fireproof box in her home at that time. Pamela stated that "[i]t did not exist in bankruptcy. It existed at a certain point of time but not in bankruptcy." Countering these statements, the Trustee called Pamela to task with her deposition statements, to which Pamela responded that she did not remember what she said at the time they were taken.

Pamela first represented in her deposition that the $100.00 cash on hand which she disclosed was "was cash on hand in my purse or sitting in the cupboard at home." However, during her April 1997 deposition, Pamela for the first time disclosed that she possessed cash in a fireproof box in her home as of the filing date. In response to the Trustee's question of how much cash she held in the box on the filing date, Pamela answered, "I don't know, maybe $1000.00." Shortly thereafter, the Trustee's repetition of this line of questioning was interrupted by Pamela's attorney, who stated that he wanted to review a copy of Pamela's bankruptcy petition with her. Pamela subsequently stated, in response to the Trustee's former question, that as to cash in her possession in August she "probably [had] none. I haven't had money for so long." Later again, in response to the same question by the Trustee, Pamela stated, "I probably had about $200.00 on August 23. I probably took it to spend on my kid's clothes or something." When asked by the Trustee why she hadn't scheduled the $200.00 in her bankruptcy, Pamela answered,

---

**6.** When later questioned at trial about the source of a $540.00 deposit made on one of her checking accounts on August 26, 1996, however, Pamela, after first stating that she had no recall of the source of the deposit, went on to admit under further questioning that a "small part" of the deposit came from sales of Mary Kay. She ventured a guess as to this amount, and stated that possibly $12.00 of the total deposit was derived from Mary Kay sales. Additionally,

Pamela acknowledged that the source of a September 3, 1996 checking account deposit in the amount of $334.91 and marked "MK," was from the sale of Mary Kay products.

**7.** In an effort to excuse this omission, she stated, in uncorroborated testimony, that she failed to disclose the income on the advice of her attorney.

"Because I knew I was going to spend it. It wasn't cash on hand, it was for kids' clothes. To me it wasn't money."

At trial the Trustee next questioned Pamela about any cash in her possession on the filing date which she had hidden at her parents' home. In response, Pamela first stated that "[i]t did not exist in bankruptcy," and went on to deny concealing $500.00 in cash at her parents' home as of the filing date. Later again at trial, however, she stated that she did have money hidden at her parents' house after the filing date, and that she "never mentioned it" because she had earmarked this money for the payment of bills. In this last respect, Pamela testified that she did not set aside the hidden money from her FBS severance pay during bankruptcy, but rather set it aside well before bankruptcy. She testified: "I set it aside to pay bills. It wasn't that it existed. I set it aside to spend." Additionally, during the course of her mostly inconsistent testimony, and in order to explain the otherwise unexplained source of many of her checking account deposits during the months preceding and following the filing date, Pamela also stated that she had substantial amounts of FBS severance pay, which she spent, hidden in her parents' house.

To counter Pamela's evasive and inconsistent trial testimony, the Trustee then introduced Pamela's statements from her April 1997 deposition, in which she made her first disclosure that she had secreted away, prior to the filing date, cash and checks received as part of her FBS severance pay in an envelope in her parents' house. By Pamela's account, the envelope contained cash in the amount of at least $500.00, but less than $5000.00, on the filing date, and possibly included one or more severance pay checks.[8]

This information conflicts with another of Pamela's assertions, that the severance pay checks were directly deposited into her FBS checking account. In further contradictory testimony on this subject, Pamela additionally stated that she spent all of this money in taking a vacation in July 1996.

*Pamela's Checking Accounts*

In Item 2 of Schedule B, entitled "Checking, Savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives," Pamela disclosed her $300.00 interest in "Community National Savings." In this regard, Pamela referred to two joint savings accounts at Community National Bank ("CNB"): one held in her and her daughter Heidi Olmstead's names, and another held in her and her daughter Billie Olmstead's names.

Pamela failed to disclose in her schedules a CNB checking account in her name, and an FBS checking account in her and William's names. At trial, when asked by the Trustee if she continued to write checks off of the FBS account after filing in bankruptcy, Pamela was evasive and attempted to avoid his question by responding that there was "no money in the account. We just used the account." At the Section 341 first meeting of creditors, the Trustee specifically questioned Pamela about all bank accounts which she held, then-existing, and she failed to make any mention of her FBS account. Additionally, it was only at this time that the Trustee learned of her CNB checking account. Also, during Pamela's April 1997 deposition, Pamela failed to disclose the FBS account and was elusive and deceitful in her responses to

---

**8.** During her deposition the following discussion ensued between Pamela and the Trustee—

Trustee: On August 23, [1996,] how much money did you have there in that envelope?
Pamela: I'm not sure.
Trustee: Give me some estimate?
Pamela: $500.00.
Trustee: Maybe $5,000.00?
Pamela: Not even close.
Trustee: Okay. How do you arrive at the figure of $500.00?
Pamela: Because the [severance pay] checks were in there and I'd cash them and I'd take

the money out. It wasn't like I kept track of how much was in there. So when I say 500, I'm saying that's how much dollars [sic] were probably in there.
Trustee: Were there checks in there?
Pamela: Not always, I'd take them and cash them.
Trustee: On August 23, 1996, did you have any checks left?
Pamela: I might have one [sic] check in August. . . .

questions in its regard.[9] These checking accounts are significant for the fact that they were the subject of much financial activity on Pamela's part prior to and after the filing date, a summary of which, derived from FBS and CNB bank statements, follows.

For the period beginning on August 2, 1996, and ending on the filing date, three checks totaling $774.85 were paid on Pamela's FBS checking account.[10] During the same time, and in the week just prior to the filing date, Pamela made three deposits into the account: one for $400.93 on August 16, 1996; one for $317.02 on August 20, 1996; and one for $93.00 on August 22, 1996. On August 27, 1996, four days after the filing date, check number 1218 in the amount of $452.38 was paid from the FBS checking account. On the same date, Pamela deposited $453.02 into the account. In the month of September 1996, an additional three checks totaling $991.92 were paid on the account. Additionally, and during the same month, Pamela made four deposits into the account totaling $1041.07.

Regarding Pamela's CNB checking account, from the beginning of August thru the filing date, Pamela made seven deposits totaling $3609.35 into the account.[11] During the period of time from the filing date thru the end of August, Pamela made an additional three deposits into her CNB checking account totaling $1230.00.[12] In September 1996, Pamela made ten deposits into the CNB checking account totaling $3988.72.[13]

9. The Trustee questioned Pamela on this point in her deposition as follows:

Trustee: Did you have a bank account at First Bank?

Pamela: I did when I worked there, but not during this time [July 1996].

10. On August 19, 1996, check number 1215 in the amount of $366.04 was paid from the FSB checking account. On August 20, 1996, check number 1216 in the amount of $312.09 was paid from the FSB checking account. On August 22, 1996, one day prior to the filing date, check number 1217 in the amount of $96.72 was paid from the FSB checking account.

11. A summary of these deposits reads as follows:

LCR = Less Cash Received
CS = child support
D = Drees
FBS = paid from William and Pamela's joint checking account at FBS

|  | Date | Cash | Check (Source) | LCR | Net Deposit |
|---|---|---|---|---|---|
| 1. | 8/2/9 | 300.00 | 441.00 CS | 21.00 | 720.00 |
| 2. | 8/6/96 | 200.00 |  |  | 200.00 |
| 3. | 8/7/96 | 100.00 |  |  | 100.00 |
| 4. | 8/12/96 | 1,000.00 | 471.22 D |  | 1,471.22 |
| 5. | 8/16/96 | 70.00 | 366.04 FBS |  | 436.04 |
| 6. | 8/19/96 |  | 312.09 FBS |  | 312.09 |
| 7. | 8/21/96 | 300.00 | 96.72 FBS | 26.72 | 370.00 |
|  | TOTAL | $1,970.00 | $1,687.07 | $47.72 | $3,609.35 |

12. A summary of these deposits reads as follows:

LCR = Less Cash Received
FBS = paid from William and Pamela's joint checking account at FBS

|  | Date | Cash | Check (Source) | LCR | Net Deposit |
|---|---|---|---|---|---|
| 1. | 8/26/96 | 100.00 | 452.38 FBS | 12.38 | 540.00 |
| 2. | 8/28/96 | 420.00 |  | 10.00 | 410.00 |
| 3. | 8/30/96 | 300.00 |  | 20.00 | 280.00 |
|  | TOTAL | $820.00 | $452.38 | $42.38 | $1,230.00 |

13. A summary of these deposits reads as follows:

LCR = Less Cash Received
D = Drees
MK = Mary Kay

*Pamela's Unexplained Checking Account Deposits*

According to a summary of Pamela's net payroll from Drees, and submitted by the Trustee, Pamela derived net income of $962.74 from Drees during the month of August 1996. She received a total of $841.00 from William during that month. By her own general estimates, her undisclosed income from Mary Kay in that month would have amounted to $160.00–180.00. These figures total at least $1963.74. Pamela, however, made deposits of $4839.13 into her CNB checking account in August 1996.

Pamela explained the source of many of her checking account deposits in 1996, or portions thereof, as being cash advances taken from credit cards.[14] Pamela asserted that she made cash advances up to and even possibly after the filing date. In this respect, she stated that she could not remember when she stopped using her credit cards, but that she probably had a "small one" after the filing date.

Yet, Pamela did not produce any of her credit card statements for the Trustee, per his request, stating instead that she "lost everything in the flood."[15] After having been contacted by the Federal Bureau of Investigation about concerns that Pamela may have committed credit card fraud, the Trustee sought and obtained Pamela's credit card statements directly from the cards' issuers. These records failed to support Pamela's claim that she had taken credit card cash advances on or near the filing date. Instead, the records demonstrated that Pamela had reached the maximum credit limits on her credit cards in Spring 1996, and that all cash advances on the cards had accordingly ceased by that time.

When asked at trial by the Trustee to explain the numerous deposits she made into her CNB checking account in September 1996, which totaled far in excess of her disclosed income for that month, just as her deposits had exceeded her monthly disclosed income and housing monies for the months of February 1996 thru August 1996, and also October 1996, Pamela, beyond identifying her disclosed income and housing money deposits, "[couldn't] tell for sure where the money came from." As to the large cash deposits Pamela made into the account between February 1996 and October 1996, Pamela, on the whole, had no definitive or credible recollection of their source or sources.

In this same vein, the Trustee pressed Pamela to explain the source of her many

FBS = paid from William and Pamela's joint checking account at FBS

|    | Date    | Cash     | Check (Source) | LCR      | Net Deposit |
|----|---------|----------|----------------|----------|-------------|
| 1. | 9/3/96  |          | 334.91 FBS     |          | 334.91      |
| 2. | 9/5/96  | 500.00   |                | 59.00    | 441.00      |
| 3. | 9/9/96  |          | 30.00 MK       |          |             |
|    |         |          | 461.99 D       | 35.00    | 456.99      |
| 4. | 9/11/96 | 300.28   |                |          | 300.28      |
| 5. | 9/16/96 | 410.00   | 607.14 FBS     |          | 1,017.14    |
| 6. | 9/17/96 | 220.00   |                | 3.00     | 217.00      |
| 7. | 9/18/96 | 700.00   |                | 20.00    | 680.00      |
| 8. | 9/23/96 |          | 501.40 D       | 40.00    | 461.40      |
| 9. | 9/26/96 | 50.00    |                | 10.00    | 40.00       |
| 10.| 9/30/96 | 320.00   |                | 10.00    | 310.00      |
|    | TOTAL   | $2,500.28| $1,935.44      | $177.00  | $4,258.72   |

14. To further support her spending habits, and particularly after separating from her husband in September 1995, Pamela stated that she "was cash advancing to pay the bills." By this, she meant that "[she] was taking any credit [she] had on [her] credit cards and making cash advances and paying the bills with the money." Pamela's self-described "problems" with credit cards predate her separation from her husband by at least five years, however.

15. By this—"the flood"—Pamela refers to the Spring 1997 flooding in North Dakota which left much of Grand Forks awash in, and submerged under, the transgressing waters of the Red River.

CNB checking account deposits in August 1996, and further pointed out the discrepancy between Pamela's monthly disclosed income and housing monies—which she steadfastly asserted to be her only income during August 1996—and the total amount of her deposits in August 1996 into her CNB checking account. Pamela's only response, beyond claiming the source of the deposits was possibly or partly from cash advances off credit cards or claiming that it was in part from Mary Kay or from her FBS severance payments, was that she could not recall. When asked by the Trustee about the source of her August 2, 1996 $300.00 cash deposit into her CNB checking account, Pamela responded: "I can't recall." Neither could she recall the source of her August 6, 1996 CNB checking account cash deposit of $200.00; her August 8, 1996 cash deposit of $100.00; her August 12, 1996 cash deposit of $1,000.00; her August 16, 1996 cash deposit of $70.00; or her August 21, 1996 cash deposit of $300.00. Pamela similarly had no recall of the source of her cash deposits into the CNB checking account of $100.00 on August 26, 1996 (although as to this she did state that possibly $12.00 was derived from a Mary Kay sale); $420.00 on August 28, 1996; and $300.00 on August 30, 1996.

## CONCLUSIONS OF LAW

### I.

By his complaint, the Trustee seeks to revoke Pamela's discharge pursuant to 11 U.S.C. § 727(d). In this respect, he alleges numerous instances of pre- and post-filing concealment of assets, as well as knowing and fraudulent omissions, falsifications, and oaths made by the debtor on her bankruptcy schedules and statement of affairs, with respect to (1) one or several checking accounts which bear her name, (2) cash in her possession, and (3) her income. The Trustee additionally seeks the recovery of property consisting of cash and the balance as of the filing date from one of Pamela's checking accounts which, he contends, (1) belongs to the bank-

ruptcy estate; (2) is in the possession of the debtor; and (3) was neither disclosed, nor turned over to him by Pamela before she obtained her discharge in bankruptcy.

"The purpose of a discharge in bankruptcy is to relieve an honest debtor from his financial burdens and to facilitate the debtor's unencumbered 'fresh start.'" *Miller v. Kasden (In re Kasden)*, 209 B.R. 239, 241 (8th Cir. BAP 1997) (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). The revocation of a discharge runs counter to this general policy, and provokes a calamity for a Chapter 7 debtor.[16] *See Olsen v. Reese (In re Reese)*, 203 B.R. 425, 432 (Bankr.N.D.Ill. 1997); *State Bank of India v. Kaliana (In re Kaliana)*, 202 B.R. 600, 603 (Bankr.N.D.Ill. 1996); *Anderson v. Poole (In re Poole)*, 177 B.R. 235, 239 (Bankr.E.D.Pa.1995). Accordingly, the Code's revocation provision is construed strictly against the party requesting the revocation of a debtor's discharge and liberally in favor of its retention by the debtor. In re Reese, 203 B.R. at 430; *In re Kaliana*, 202 B.R. at 603; *Mazer v. Jones (In re Jones)*, 178 B.R. 1, 3 (Bankr.D.N.M. 1995); *Buckstop Lure Co. v. Trost (In re Trost)*, 164 B.R. 740, 743 (Bankr.W.D.Mich. 1994). Thus, the requesting party bears the burden of proof under such an action. *In re Yonikus*, 974 F.2d 901, 904 (7th Cir.1992); *In re Reese*, 203 B.R. at 430; *In re Kaliana*, 202 B.R. at 603. The standard necessary to establish the elements under a revocation action is that of a preponderance of the evidence. *Kaler v. Craig (In re Craig)*, 195 B.R. 443, 448–49 (Bankr.D.N.D.1996); *First Nat'l Bank of McClusky v. Zinke (In re Zinke)*, 174 B.R. 1017, 1021 (Bankr.D.N.D.1994).

The revocation provision which governs this appeal is Code § 727(d), which provides in relevant part that upon the request of the trustee, and after notice and a hearing, the court shall revoke a debtor's discharge under Section 727(a) if, "(1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of

---

**16.** When a Chapter 7 debtor's discharge is revoked, "all of [the debtor's] debts are reinstated," *Wood v. Cochard (In re Cochard)*, 177 B.R. 639, 642 (Bankr.E.D.Mo.1995); and yet, all of the debtor's property having been previously liquidated, he or she is no longer possessed of any assets from which to pay these debts.

such fraud until after the granting of such discharge[.]" 11 U.S.C. § 727(d)(1). Thus, in the instant matter, the Trustee must prove the following statutory elements by a preponderance of the evidence: (1) that Pamela procured her discharge by fraud; and (2) that the Trustee was unaware of Pamela's fraud prior to her discharge. 11 U.S.C. § 727(d)(1); *see Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir.1991); *In re Kaliana*, 202 B.R. at 604; *Miller–Claborn Distribution Co. v. Richard (In re Richard)*, 165 B.R. 642, 643–44 (Bankr.W.D.Ark.1994); *In re Trost*, 164 B.R. at 748.

Under the first element, the Trustee must establish that Pamela acted with a knowing intent to defraud. *In re Yonikus*, 974 F.2d at 905; *Bowman v. Belt Valley Bank (In re Bowman)*, 173 B.R. 922, 925 (9th Cir. BAP 1994); *In re Kaliana*, 202 B.R. at 604; *In re Jones*, 178 B.R. at 3–4. He must prove that she "committed a fraud in fact which would have barred the discharge had the fraud been known." *In re Edmonds*, 924 F.2d at 180; *see In re Jones*, 178 B.R. at 3–4; *In re Trost*, 164 B.R. at 748. The Court of Appeals for the Seventh Circuit, in *In re Yonikus*, described the methods for establishing the fraudulent intent contemplated under the statute, as follows:

> The trustee may prove the debtor's fraud by evidence of the debtor's awareness of the omitted asset and by showing that the debtor knew that failure to list the asset could seriously mislead the trustee or that the debtor acted so recklessly in not reporting the asset that fraud is implied. The bankruptcy court's finding of fraudulent intent may be based on inferences drawn from a course of conduct. Additionally, fraudulent intent may also be inferred from all of the surrounding circumstances. Concealment of assets can be grounds for disallowance of exemptions, "to hold otherwise would be to reward debtors who conceal assets from the estate."

974 F.2d at 905–06 (quoting *In re Magnuson*, 113 B.R. 555, 560 (Bankr.D.N.D.1989)); *accord In re Kasden*, 209 B.R. at 244.

In order to succeed under the second element of the statute, the Trustee must establish that he was unaware of facts which would have put him on notice of the possible commission of fraud on Pamela's part prior to her discharge. *See Mid–Tech Consulting, Inc. v. Swendra*, 938 F.2d 885, 888 (8th Cir. 1991); *In re Edmonds*, 924 F.2d at 180; *In re Bowman*, 173 B.R. at 925; *West Suburban Bank v. Arianoutsos (In re Arianoutsos)*, 116 B.R. 116, 119 (Bankr.N.D.Ill.1990). This is so, for it is the Trustee's duty "to investigate diligently any possibly fraudulent conduct before discharge." *Swendra*, 938 F.2d at 888; *see In re Bowman*, 173 B.R. at 925; *In re Cochard*, 177 B.R. at 643.

The relevant date for purposes of asset valuation is the date on which the debtor's petition in bankruptcy was filed, *In re Magnuson*, 113 B.R. at 558, which in this case is August 23, 1996.

### II.

Initially, the Court notes that much of Pamela's testimony at trial and many of her deposition statements were contradictory and less than forthright. Pamela's testimony at trial as to the cash on hand which she possessed as of the filing date in both her and her parents' homes, and her testimony as to the income she derived from selling Mary Kay products, as well as to her net income from Drees, contrasts sharply at times with statements she made at her deposition. This is particularly true and relevant as to Pamela's recollections in her deposition that she did indeed possess cash on hand on the filing date, and that she did earn income from the sale of Mary Kay products in the month of August 1996; recollections which had all but evaporated at trial. The Court concludes that in the areas where Pamela's trial and deposition statements conflict, Pamela's deposition testimony proves the more credible. First, Pamela's deposition testimony is more specific and detailed on these points. Additionally, and perhaps because Pamela's deposition occurred closer in time to the events in question, Pamela's memory failed her less often, and Pamela enjoyed better recall, as to the events in question during her deposition rather than at trial. Pamela's repeated memory lapses at trial as to very significant events, her elusiveness in responding to the

Trustee's questioning, and her complete failure to satisfactorily explain even some of her significant cash deposits into her checking accounts throughout 1996, additionally support this result.

*Pamela's Income*

■ In her schedules, Pamela stated that she earned $800.00 in net monthly income from Drees.[17] However, the evidence clearly demonstrates that Pamela never earned as little as $800.00 in net income in any month in which she was employed by Drees in the period from October 1995 thru August 1996, and Pamela herself has admitted as much. Pamela's net wages during this eleven-month time period averaged $1025.44 monthly, and were as high as $1266.72 in July 1996, the month immediately preceding her filing in bankruptcy.

The focus of Schedule 1, however, is upon the debtor's "current income," as to which Pamela stated her "total net monthly take home pay" from Drees amounted to $800.00. Yet, for the entire month of August, Pamela earned $962.74 in net income from Drees. By any standard, her net monthly take home pay from Drees, as of the filing date, was not $800.00 as sworn.

This deliberate omission is compounded by Pamela's statements under oath that she earned an average of $900.00 in net monthly income from Drees. The uncontroverted evidence demonstrates that in only three months out of the eleven prior to the filing date did Pamela earn $900.00 or less in net monthly income from Drees. She averaged $1025.44 during the eleven-month period prior to the filing date, and $1026.02 for the period of January 1996 thru August 1996.

Additionally, when Pamela's income of at least $160.00–180.00 monthly from Mary Kay is included in figuring her total net monthly take home pay at the time of the filing date, as it needs be, the discrepancy between Pamela's reported income and the income Pamela actually earned widens significantly. Pamela's total net income then becomes at least $1122.74 for August 1996.

Again, Pamela's deliberate omission is compounded by statements she made under oath that her disclosed income constituted the only income she received in August, that she did not derive income from the sale of Mary Kay products, and that she did not believe that the amount of income she derived from the sale of Mary Kay products was enough to mention in her schedules. The Court flatly rejects her first and second assertions as being false. As to her third, her mistaken belief as to what she was or was not required to report in her schedules does not excuse her omission of this income therein. "Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate." *In re Yonikus,* 974 F.2d at 904; *accord In re Kasden,* 209 B.R. at 243–244.

The Court concludes that Pamela knowingly and willfully intended to deceive and defraud the Trustee, and this Court, as to her net income from Drees, the only employment she disclosed in her schedules, and as to her income from the sale of Mary Kay products, by falsehoods and omissions which she made on her schedules and on the witness stand at trial in this connection. Pamela's course of conduct and all the surrounding circumstances of this matter raise the inference that she possessed the requisite fraudulent intent necessary to revoke her discharge under Section 727(d)(1).

*Pamela's Personal Property*

■ In her schedules Pamela stated that she possessed $100.00 cash on hand as of her filing date. Subsequently, Pamela admitted that she possessed at least $500.00—but less than $5000.00—in cash on the filing date, which she had concealed in an envelope in her parents' home along with one or more severance pay checks or their cash equivalent. She additionally admitted possessing $1000.00 or $200.00 in cash, alternatively, which she kept in a fireproof box in her home as of the filing date. Although she also denied concealing cash as of the filing date,

---

**17.** Pamela left blank the space provided at the bottom of the page on Schedule I in which debtors shall "[d]escribe any increase or decrease of

more than 10% in any of the above categories anticipated to occur within the year following the filing of this document."

stating that she had spent it on a vacation in July 1996, the fact that she did admit to possessing at least $500.00 cash in her parents' home as of the filing date, and also that she later definitively asserted that she was in possession of either $1000.00 or $200.00 cash in a fireproof box in her home on and after the filing date—which she stated she did not believe belonged to the bankruptcy estate or concerned her bankruptcy proceedings, but which she had earmarked for the payment of bills—all lead the Court to conclude that she did possess at least $700.00 cash on hand as of the filing date, at least $600.00 of which was undisclosed. Additionally, Pamela had sufficient recall concerning the latter months of 1996 to definitively state that she possessed, deposited into her checking account, and spent, severance money in the months in 1996 following her filing date.[18]

■ The Court rejects Pamela's defense that because she had earmarked this cash as money to be spent, that she therefore need not have listed it in her schedules. Any money which Pamela retained in her possession as of the filing date belonged to the bankruptcy estate, was required to be disclosed to the Trustee, and could no longer be spent by Pamela as she chose fit. Her alleged failure to grasp this fact[19] does not excuse the deceit she practiced in this matter in her schedules, at her 341 first meeting of creditors, at her deposition and at trial. Accordingly the Court finds that Pamela's failure to disclose the $600.00 in additional cash on hand in her possession as of the filing date, and her numerous attempts to deceive the Trustee and this Court as to the existence of these monies at that time, are suffi-

cient to warrant a revocation of her bankruptcy discharge under Section 727(d)(1).

### Pamela's Checking Accounts

■ In her schedules, Pamela stated that she held $300.00 in Community National Bank savings accounts as of her filing date. Pamela omitted any mention in her schedules, and failed to later amend them to reflect the fact, that she also held a checking account in her name at CNB and a joint checking account in both her and William's names at FBS. Evidence adduced at trial demonstrates that Pamela's FBS checking account held a balance of $646.18, and her CNB checking account held a negligible positive balance, if not a negative balance, as of the filing date.

Aggravating Pamela's omission is the fact that she failed to disclose the existence of these accounts to the Trustee at the Section 341 first meeting of creditors, even after having been specifically questioned about any account which she held at the filing date, and that Pamela failed to disclose the FBS checking account to the Trustee even during her April 1997 deposition. That Pamela continued to make deposits and write checks on these accounts up to and after the filing date is additionally troubling.

Pamela's deliberate omission of these accounts and their balances in her schedules, along with her ensuing conduct when questioned in their regard, lead the Court to conclude that she possessed the necessary fraudulent intent which warrants revocation of her discharge in bankruptcy under Section 727(d)(1).

18. Parenthetically, if the Court were to accept Pamela at her word on this point, it would follow that Pamela owed the Trustee many more thousands of dollars for concealed assets than either she or he anticipated. Because Pamela received her last severance pay check on March 1996, any money which she possessed post-filing from this source would be imputed to her possession as of the filing date as well. Pamela could not recall the source of the vast majority of her cash deposits in the months post-filing, but stated that these deposits were likely made up, at least in part, and perhaps in large part, of her severance pay. Were the Court to take her at her word and to impute the source of these cash deposits to sever-

ance pay checks which she possessed and concealed from the Trustee before, during and after the filing date, the Court would then be left to conclude that Pamela withheld from the Trustee, and later consumed, thousands of dollars of severance pay, which constituted property of the estate, after the filing date.

19. Schedules are very simple forms and are easy to read, particularly by someone who works in a bank. Pamela worked in a bank and now works in an accounting office. The schedules she was required to fill out should have left her with no question as to her disclosure obligations.

*Pamela's Unexplained Checking Account Deposits*

When Pamela's disclosed income is contrasted against the numerous and substantial deposits she made into her undisclosed checking accounts with CNB and FBS during the month of August, both prior and subsequent to the filing date, Pamela's sworn statement as to her disclosed income of $1,241.00,[20] becomes something of a fiction. During the month of August alone, Pamela was in receipt of at least $3,598.13 in excess of her disclosed income. After August 23, 1996, she continued to make deposits into her undisclosed CNB checking account which totaled at least $1,230.00 for the period of August 23, to August 30, 1996. Pamela's professed sources of income do not account for her total CNB checking account deposits of $4,828.13 in August 1996.

When asked to explain the source of these excess deposits, Pamela repeated time and time again that she could not recall. Yet, when asked by the Trustee to explain the source of several small cash deposits, mostly of $20.00, dating as far back as February 1996, Pamela immediately recollected receiving those funds as gifts from her mother. One would suppose that an individual on the brink of financial calamity and collapse would have at least some minor recollection of the source of $1,970.00 in cash deposits in the several weeks and last few days before she succumbed to her financial woes and filed for protection in bankruptcy, as well as the source of $820.00 in cash deposits in the week following that event. This is doubly true of an individual with a net income such as that which Pamela derived from Drees, which, for the entire month of August, stands at barely one-third of her total cash deposits into her CNB checking account during that month.

Her failing memory as to each of her cash deposits is of no assistance to her cause in this action. In this respect, Pamela was uncooperative with the Trustee as he attempted to perform his statutory duties in these proceedings. Pamela's failed memory at trial, when considered in light of the very substantial omissions and misstatements which she knowingly made on her bankruptcy schedules, is just another indicium of her attempts to bend these bankruptcy proceedings to her self-serving and dishonest purposes.

**III.**

From the inception of Pamela's bankruptcy proceedings and his involvement therein, the Trustee has repeatedly and specifically requested that Pamela provide him with all pertinent information concerning, inter alia, her bank accounts, cash on hand, and income. In her schedules, Pamela made no disclosure of her FBS and CNB checking accounts, and only disclosed a joint interest with her daughters in CNB savings accounts of $300.00. At the Section 341 first meeting of creditors, the Trustee specifically questioned Pamela about all bank accounts which she had then-existing; she failed to make any mention of her FBS checking account. Only after receiving her discharge, was the Trustee first apprised of this account.

In her schedules, Pamela only disclosed that she possessed $100 cash in hand on the filing date. During the Section 341 first meeting of creditors, the Trustee specifically questioned Pamela about her cash on hand, and she affirmed that it amounted to only $100.00. Again, only after her discharge, during her April 1997 deposition, did Pamela for the first time disclose her interest as of the filing date in either $1000.00 or $200.00 cash in a fireproof box in her home, as well as in at least $500.00, but less than $5000.00, of cash which she concealed in her parents' home.

In her schedules, Pamela declared her total net take home pay was derived exclusively from Drees and amounted to $800.00 on the filing date. Although the Trustee questioned Pamela as to all sources of her income during her Section 341 first meeting of creditors, only after discharge, during her April 1997 deposition, did the Trustee first learn that Pamela derived income from the sale of Mary Kay beauty products.

---

**20.** The sum would become $1,641.00 if one were to include her belated disclosure of $400 in housing monies, however, Pamela neglected to detail this sum in her schedules.

Thus, the Court concludes that the Trustee has satisfied the burden under Section 727(d)(1) of proving by a preponderance of the evidence that he was unaware of Pamela's fraud as to the above-described property prior to her discharge. Despite diligent efforts by the Trustee to ascertain Pamela's financial circumstances as of the filing date, he was prevented from doing so by Pamela's fraudulent omissions and false statements in this regard, until more than five months after her discharge in bankruptcy.

## IV.

Pamela's conduct and attempts to subvert the bankruptcy process throughout these proceedings have been persistent, and fully warrant the revocation of her discharge in bankruptcy. While the laws of bankruptcy generally provide relief to debtors seeking assistance thereunder, they also require, in return, that such debtors be fully forthcoming about their financial affairs. Rule 4002 of the Federal Rules of Bankruptcy Procedure, entitled "Duties of Debtor," provides in pertinent part that:

In addition to performing other duties prescribed by the Code and rules, the debtor shall:

(1) attend and submit to an examination at the times ordered by the court;

. . .

(3) inform the trustee immediately in writing as to the location of real property in which the debtor has an interest and the name and address of every person holding money or property subject to the debtor's withdrawal or order if a schedule of property has not yet been filed pursuant to Rule 1007;

(4) cooperate with the trustee in the preparation of an inventory, the examination of proofs of claim, and the administration of the estate. . . .

FED.R.BANKR.P. 4002(4). Additionally, Section 521, entitled "Debtor's Duties and Benefits," provides that,

(3) if a trustee is serving in the case, cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title;

(4) if a trustee is serving in the case, surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate, whether or not immunity is granted under section 344 of this title[.]

11 U.S.C. § 521(3)–(4). These provisions operate in conjunction with Sections 343 of the Code, and Rules 1007 and 2015(a) of the Federal Rules of Bankruptcy Procedure, to further compel complete and accurate disclosure by the debtor of, inter alia, assets, income and financial affairs, and subsequently disclosure of such information by the bankruptcy trustee to the United States Trustee.

In the instant matter, Pamela has been uncooperative, and knowingly and willfully untruthful in her dealings with the Trustee. Additionally, Pamela acknowledged numerous inaccuracies within her petition and schedules, of which she was aware prior to their filing and prior to the moment when she affixed her signature thereon, and about which she did nothing. Nevertheless, she stated that she remembers signing her bankruptcy petition and schedules and swearing to their truth and correctness under oath, and additionally recalls swearing under oath at the Section 341 initial meeting of creditors that the information contained within her bankruptcy petition was true and correct to the best of her knowledge at the filing date. Moreover, inaccuracies and concealment of estate property beyond those which Pamela had previously acknowledged were brought out during the course of trial and during her deposition.

In order to excuse the inaccuracies which she acknowledged in the documents, Pamela stated, in her remarks to the Court, that she had "only two minutes" to review her bankruptcy petition and schedules, as prepared by her attorney, and that had she demanded changes she would have been required to pay more attorney's fees than she already had. In order to excuse her concealment of estate property from the Trustee, Pamela simply stated that, at least in her mind, cash which she concealed simply "did not exist in bankruptcy," although her later statements did belie the assertion. As to her false state-

ments concerning her net income from Drees, she had little to say. As to her numerous unexplained checking account deposits, she simply had no recall on the stand as to their sources. Pamela's general claims that her actions during the bankruptcy proceedings were prompted by the advice of counsel or by the Trustee's "harassment" of her, are wholly without merit and uncorroborated.

In sum, the Court can only state that Pamela failed utterly in her lawful duties as a debtor. Her omissions and misstatements provoked the expense and the waste of considerable effort and resources during the course of these proceedings, which would not have been occasioned had she merely been truthful from the inception thereof, as she was required to be by law. Pamela voluntarily chose to file her Chapter 7 petition in bankruptcy, and thus voluntarily subjected herself to the appurtenant requirements of law under the Code.

## V.

 Lastly, the Trustee seeks to recover from Pamela property of the bankruptcy estate. Section 542(a) provides that an individual in possession of property of the estate must deliver and account for such property to the Trustee. 11 U.S.C. § 542(a); *see In re Magnuson*, 113 B.R. at 560. Pursuant to Section 541(a), the bankruptcy estate is generally comprised of all of a debtor's legal and equitable interests in property as of the commencement of the case. 11 U.S.C. § 541(a); *see In re Magnuson*, 113 B.R. at 560.

In the instant matter, Pamela filed her petition on August 23, 1996. At that time, she declared in her schedules disclosed income of $1241.00, and interests in $100 cash on hand and a $300 total balance in joint savings accounts with her two daughters, respectively. At that time, Pamela, as previously determined, failed to disclose that she possessed an ownership interest of at least $500.00 cash in her parents' home; at least $100.00 in additional cash on hand in her home; a balance of $646.18 in her FBS

checking account; income of at least $160.00 from the sale of Mary Kay products; and at least $162.74 in additional income from Drees.[21] Pamela thus possessed at least $1568.92 in estate property which she failed to disclose, exempt, or turn over to the estate.

## VI.

Accordingly, for the reasons stated, **IT IS ORDERED** that the discharge granted to Pamela A. Olmstead by this Court on December 2, 1996, is hereby **REVOKED. IT IS FURTHER ORDERED** that Pamela A. Olmstead turn over to the Trustee the sum of $1568.92.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

**SO ORDERED.**

---

**21.** The Court notes that Pamela additionally failed to schedule the $400.00 in housing monies she received monthly from William. This sum was not requested as part of the motion to recover estate property.